UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA AND THE STATE OF NEVADA ex rel. MARY KAYE WELCH,<br><br>Plaintiff,<br>v.<br>MY LEFT FOOT CHILDREN'S THERAPY, LLC, JON GOTTLIEB, AND ANN MARIE GOTTLIEB,<br><br>Defendants. | Case No. 2:14-cv-01786-MMD-GWF<br><br>ORDER<br><br>(Def's Motion to Dismiss – ECF No. 68) |

## I.  SUMMARY

This case involves allegations of Medicaid and Tricare fraud brought against a Las Vegas children's rehabilitative functional therapy company and the company's owners. Before the Court is Defendant My Left Foot ("MLF"), Jon Gottlieb and Ann Marie Gottlieb's (collectively, "the Gottliebs") Motion to Dismiss the First Amended Complaint ("Motion"). (ECF No. 68.) The Court has reviewed Plaintiff's response (ECF No. 69) and Defendants' reply (ECF No. 71), as well as the federal government's Statement of Interest (ECF No. 80) and Defendants' reply (ECF No. 81). Defendants also filed a Notice of Supplemental Authority (ECF No. 86) without leave of court as is required by Local Rule LR 7-2(g). The Court will strike the notice. The Court's analysis is based solely on the briefs mentioned above. Plaintiff's motion and amended motion to strike the supplement (ECF Nos. 87, 88) are denied as moot.

1 For the reasons stated below, Defendants' Motion is granted in part and denied in part.

**II. BACKGROUND**

Plaintiff-relator Mary Kaye Welch ("Welch" or "Plaintiff") brings suit under both the federal and Nevada False Claims Act on behalf of the Government.[1] Both the federal and the Nevada False Claims Act make liable anyone who: knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or, knowingly makes, uses, or causes to be made or used, a false record or statement to get a claim paid or approved by the Government. 31 U.S.C. § 3729(a)(1)(A) & (B); NRS § 357.040(1)(a) & (b). Welch filed her initial Complaint under seal pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. § 3279 *et seq.*, and the Nevada False Claims Act ("Nevada FCA"), NRS § 357.010 *et seq.*, on October 28, 2014. (ECF No. 1.) The Court unsealed the Complaint on June 1, 2015 (ECF No. 10). Welch filed the First Amended Complaint ("FAC") on September 28, 2015 (ECF No. 15). In the FAC, Welch added allegations concerning Defendants' alleged policy of "upcoding" therapy services to obtain higher rates of reimbursement under the Medicaid and Tricare programs. The facts below are taken from the FAC.

MLF provides physical, occupational, speech, and aquatic therapy as well as adaptive swimming lessons and group classes for children with special needs. It is owned by Ann Marie Gottlieb and her husband, Jonathan Gottlieb. Ann Marie is a qualified occupational therapist. Jonathan has no qualifications in occupational, speech, or physical therapy. MLF has four Las Vegas locations, roughly 55 to 100 employees, and as of 2012 was treating approximately 1,200 children per week. MLF now treats closer to 1,800 children per week. Of the roughly 55 to 100 employees at MLF, approximately 31 work exclusively on administrative matters.

///

---

[1] "Government" refers collectively to the federal government and the State of Nevada.

MLF bills roughly 70 percent of its services to Medicaid. The Medicaid program provides health care benefits to low-income children and is funded jointly by the federal and state governments. MLF also bills roughly 20 to 25 percent of its services to Tricare. Tricare is a federally-funded program that provides health care benefits to service members and their families. Under both Nevada and federal law, services reimbursed under Medicaid and Tricare must be medically necessary.[2]

Welch claims that certain of Defendants' policies have resulted in the submission and approval of false claims by the Medicaid and Tricare programs. Before MLF provides services, Defendants pre-fill medical authorization forms for those doctors who make therapy referrals. As a result, children receive all forms of therapy, including medically unnecessary occupational and physical therapy for children who come to MLF for speech therapy services. Once a child begins therapy at MLF, the Gottliebs have a policy of treating every child that comes through the door, regardless of medical necessity or proper medical authorization. Moreover, they do not permit therapists to discharge patients. In order to continue services for certain patients, Defendants require therapists to change patients' progress reports to note that therapy should be continued, that there is parental involvement and that therapists require at least two sessions per week, even if none of these statements is actually true. Therapists are also required to recommend the highest number of weekly therapy sessions without regard to a patient's specific medical needs. In addition, MLF's policies that every child should be treated and that all children make some progress result in patients who are too low-functioning, too high-functioning, and who speak Spanish receiving medically unnecessary therapy services. The FAC also

---

[2] The Nevada Medicaid plan allows for reimbursement of outpatient services so long as those services are medically necessary. Medicaid Services Manual § 1700. To be considered medically necessary, therapy services must "be considered under accepted standards of medical practice to be specific and effective treatment" and the "amount, frequency, and duration for restorative therapy services must be appropriate and reasonable based on best practice standards for the illness or injury being treated." *Id.* at § 1703.2A(5)(b), (e). Under the Tricare program, a service is "medically or psychologically necessary" if the "frequency, extent, and types of medical services . . . represent appropriate medical care and [ ] are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of illness, injury, pregnancy, and mental disorders." 32 CFR § 199.2.

1  contains allegations that the Tricare program was billed for therapy sessions which did
2  not, in fact, occur. (ECF No. 15 at 20-21.)

An additional theory of liability emerges from Welch's allegations concerning upcoding. She claims that Defendants require all therapists who work for MLF to bill services[3] under the same code—CPT code 97530—regardless of whether the therapist believes a different code more accurately describes the services rendered. Reprimand and/or termination supposedly results when therapists do not comply with this requirement. The purpose of using the one CPT code is to obtain the highest rate of reimbursement while also eliminating particular administrative costs.

The FAC asserts the following claims against each of the three Defendants individually:[4] (1) knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval under the FCA, 31 U.S.C. § 3729(a)(1)(A); (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim under the FCA, 31 U.S.C. § 3729(a)(1)(B); (3) knowingly presenting or causing to be presented a false claim for payment or approval under the Nevada FCA, NRS § 357.040(a); and (4) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim under the Nevada FCA, NRS § 357.010(b). (*See id.* at 29-70.)

**III.  DISCUSSION**

  **A.  Legal Standard**

Complaints brought pursuant to the FCA must fulfill the heightened pleading requirements of Rule 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). A motion to dismiss "grounded in fraud under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal

---

[3] It is unclear if the therapists actually submit the claims to Medicaid and Tricare or if they provide specific information to the administrative/insurance department who then submit the reimbursement requests.

[4] Thus, there are a total of twelve counts in the FAC.

4

quotation marks omitted). "Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner." *Id.*

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Rule 8 notice pleading standard requires Plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* (internal quotation marks and citation omitted). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pleaded factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 678. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but it has not show[n]— that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the

complaint must be dismissed. *Twombly*, 550 U.S. at 570. A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)).

**B. Analysis**

Defendants move to dismiss the FAC on five grounds. First, Defendants argue that the FAC fails to meet Rule 9(b)'s heightened pleading standard. (ECF No. 68 at 4.) Second, they argue that Welch alleges nothing more than a difference of opinion as to the medical necessity of the therapy provided. (*Id.* at 12.) Third, they argue that Welch's claims of upcoding are barred by the FCA and Nevada FCA's public disclosure bar. (*Id.* at 16.) Fourth, they contend that Welch's allegations of improper practices promoted through MLF's policies are insufficient to establish liability under either the FCA or Nevada FCA. (*Id.* at 21.) Defendants also make a fifth argument relating to patient H.W., for whom MLF allegedly billed thirteen therapy services that were not actually provided. (*Id.* at 22.)

The Court agrees with Defendants that Welch's claims premised on upcoding are barred by both the FCA and Nevada FCA public disclosure bar. The Court, however, finds that the claims concerning billing for medically unnecessary services and the claims concerning patient H.W. satisfy Rule 9(b).[5]

**1. Rule 9(B)**

Defendants contend that Counts I, II, III, VII, VIII and X should be dismissed pursuant to Rule 9(b) because Welch "does not identify a single false claim that resulted in a violation of the FCA, let alone state with any specificity who submitted the false claim, how the claim was false, or when the false claim was submitted." (ECF No. 68 at 4.) They also request that Counts IV (page 40), V, VI, IV (page 61),[6] XI and XII be dismissed for

---

[5]The FAC presents several theories of FCA liability. The Court focuses only on those allegations and accompanying theories that state plausible claims under both the FCA and Nevada FCA.

[6]The Counts in the FAC are misnumbered such that there are two counts designated as "Count IV" and there is no "Count IX." The Court distinguishes between each Count IV by referring to the page number on which the allegations begin.

6

failure to allege any false records or statements under 31 U.S.C. § 3729(a)(1)(B). (*Id.* at 11.)

To comply with Rule 9(b), allegations of fraud must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (internal quotation marks and citation omitted). However, the rule does not require that the complaint provide all facts supporting each and every instance of fraud over a multi-year period. *United States ex rel Lee v. SmithKline Beecham Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001) (citing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)). In order to satisfy the requirements of Rule 9(b) in an FCA action, a relator must either allege with detail that a false claim was actually submitted to the government or at a minimum allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz*, 606 F.3d 993, 998-99 (9th Cir. 2010). The complaint in an FCA action "must state enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citing *Twombly*, 550 U.S. at 556) (internal quotation marks).

The FAC outlines the process by which an organization like MLF submits claims for reimbursement to the Medicaid program for therapy services performed by its employees. First, a physician refers a child to the organization for particular types of therapy, which the physician has identified to be medically necessary. (*See* ECF No. 15 at ¶¶ 53, 66.) The child then sees a qualified therapist in order to receive the prescribed services. (*See id.* at ¶ 66.) Before the therapist provides an initial or a continuing therapy session to the child, the entity that submits claims for the therapist's services to the Medicaid program for reimbursement—here, the FAC states that the entity at MLF is its "insurance department" (*see id.* ¶ 95)—must request authorization from the Medicaid program to perform those services (*see id.* at ¶ 69). Authorization requires submission of a specific

form through an online system called HP Enterprise Services. (*See id.* at ¶¶ 70-72.) In support of the authorization request, the organization submits therapists' progress reports and notes.[7] (*See id.* at ¶ 73.) Once Medicaid reviews the form and supporting documentation, it approves a certain number of sessions of particular types of therapy services for the patient. (*See id.* at ¶ 74.) Once the session has occurred, the entity then submits a claim for reimbursement for the services to the program, and the services identified in the claim must match the services requested and approved in the prior authorization (*See id.* at ¶ 75.) MLF's insurance department is responsible for the submission of claims. (*See id.* at ¶ 95.) Plaintiff contends that this department pre-checks all boxes on the Medical Necessity Form that referring physicians sign. (*See id.* at ¶¶ 92-95.) The FAC states that "Tricare is run substantially similar to Medicaid." (*Id.* at ¶ 68.) The Court therefore infers that the process for submitting claims to Tricare is roughly analogous to the process by which claims are submitted to Tricare.

A claim submitted to a federal health care program is false where a party falsely certifies compliance with a statute or regulation as a condition to Government payment. *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006); *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) ("It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."). To successfully plead a violation under the FCA,[8] the plaintiff must allege that defendant (1) made a false statement or engaged in a fraudulent course of conduct, (2) made with scienter (3) that was material to and (4) caused the Government to pay out money. *Hendow*, 461 F.3d at 1174.

The FAC provides sufficient facts to allege the element of falsity. Medical necessity is an express requirement for reimbursement under the Medicaid and Tricare programs.

---

[7]Ostensibly, this occurs only in the context of continuing therapy services and not when an initial therapy service is provided to a patient by an MLF therapist.

[8]The Court focuses on the federal FCA and relevant case law, but the wording of the federal and Nevada statutes is the same. Therefore, the analysis applies to the Nevada FCA claims in the FAC as well.

8

Under the Nevada Medicaid program, "Medicaid reimbursement for outpatient [physical, occupational, and speech therapy] is based on the provision of medically necessary therapy services. (ECF No. 80 at 2 (quoting Medicaid Services Manual § 1700) (internal quotation marks omitted).)[9] Welch alleges that MLF and the Gottliebs required staff to provide treatment to patients, even if the reviewing therapist deemed the frequency or continuation of a particular type of treatment to be medically unnecessary. (*See, e.g.*, ECF No. 15 at ¶¶ 159-164.) For instance, in the FAC, Welch alleges that, "Jonathan and Anne Marie direct all of MLF's insurance department staff to ask therapists to change their evaluation reports if the recommended therapy frequency is listed for less than two or three sessions per week." (*Id.* at ¶ 95.) This allegation is supported by an excerpt from an email sent by Jonathan to MLF therapists directing them to put down the highest number of recommended weekly visits for patients. (*Id.* at ¶ 101.) From these allegations, the Court can reasonably infer that the Gotliebs required therapists to provide information in their progress notes that ensured a higher number of sessions would be authorized by Medicaid or Tricare regardless of the medical needs of the child. Directing or requiring a reviewing therapist, who after evaluation of a patient has determined a set number of sessions per week is medically necessary, to then change her recommendation necessarily requires the therapist to falsify documents, specifically the progress notes and written justifications for the recommendation. This documentation is then submitted by MLF's insurance department in support of claims for reimbursement. Plaintiff's allegations permit the Court to reasonably infer the possibility of misconduct—that is, false statements or fraudulent conduct—which satisfies the first element of FCA liability.

Neither Defendants nor Plaintiff address whether the FAC sufficiently identifies facts to support the element of scienter. Under both the FCA and Nevada FCA, scienter is established by proving that Defendants had actual knowledge of the falsity of the statements submitted to the Government, acted in deliberate ignorance of the truth or

---

[9]*See supra* note 2 (regarding medical necessity requirement under the Tricare program).

9

falsity of those statements, or acted in reckless disregard of the truth or falsity of those statements. *See* 31 U.S.C. § 3729(b)(1)(a)(i) - (iii); *see also* NRS § 357.040(2)(a) - (c). By establishing a policy that all children make some progress, no matter how minimal, and by reprimanding therapists who determine that continuing therapy is medically unnecessary—for instance, in the example of a therapist recommending discharge of a patient based on the patient's lack of progress (*see* ECF No. 15 at ¶¶ 168-171)—Defendants clearly demonstrate disregard for whether the statement—i.e., making progress on patient's goals and recommending that the patient continue to receive therapy (*see id.* at ¶ 171)—is true or false. Similarly, by requiring a certain frequency of weekly visits to be recommended, even where therapists determine only one session per week is medically necessary, Defendants act with deliberate indifference as to the truth or falsity of statements made in support of claims submitted for reimbursement.

The FAC also provides sufficient facts to allege the element of materiality. Defendants assert that "[Welch] fails to identify a single false record or statement that is material to a false claim." (ECF No. 68 at 4.) Welch responds that "the complaint alleges that MLF directs it therapists to falsify progress reports . . . [which] are submitted to Medicaid to secure re-authorization of funding and are a precondition to funding.'" (ECF No. 69 at 19 (internal quotation marks omitted).) From this and the allegations discussed above, the Court is able to draw a reasonable inference that therapists' progress notes, which include recommendations and statements made in support of those recommendations, were material to the Government's decision to pay because the Medicaid and Tricare programs do not reimburse for medically unnecessary services.

Defendants contend that the FAC does not explain how MLF caused the presentation of a false claim, which is necessary to satisfy the causation element. (ECF No. 68 at 10.) Plaintiff responds that the FAC "described numerous communications from the Gottliebs which established that they, individually, caused to be submitted false claims for payment." (ECF No. 69 at 20.) The Court agrees with Plaintiff. The Court can reasonably infer that the alleged requirement that therapists continue to provide therapy

or provide therapy at particular frequencies without regard to medical necessity as determined by the individual therapist, or else be reprimanded or potentially fired, was the cause of allegedly falsified statements in progress notes that were then used to obtain reimbursement under the Medicaid and Tricare programs.

Defendants also contend that the FAC "does not allege that any of the children identified in the FAC were Medicaid or TRICARE beneficiaries or that MLF submitted claims to the government for their care." (ECF No. 68 at 12.) However, the FAC, where possible, identifies if the patient is a recipient of Government benefits—e.g., H.W. received benefits under Tricare (ECF No. 15 at ¶ 186)—and also identifies what percentage of MLF patients and claims were reimbursed under the Medicaid and Tricare programs (*id.* at ¶¶ 36, 64, 67). The FAC's examples of certain patients' experiences at MLF appear to be just that—examples of medically unnecessary services being rendered as a result of MLF's policies and directives. The Court is able to draw a reasonable inference from these examples that the policies and directives impacted all MLF patients, regardless of insurance status.

### 2. Medical Necessity

Defendants contend that the FAC "alleges nothing more than a difference of opinion as to the medical necessity of the therapy provided," which is "insufficient to ground a suit under the FCA." (ECF No. 68 at 12.) Defendants argue that because a physician authorized the initial referral for therapy services and the FAC fails to identify any specific documentation that an MLF therapist falsified (which was then submitted to the Government), Welch is alleging a mere difference of opinion as to what other therapists at MLF deemed to be medically necessary. (*Id.* at 14.)

The FAC does not allege that all claims for reimbursement of therapy services ever provided to Medicaid or Tricare patients were medically unnecessary; rather, the FAC points to those MLF's policies that directed qualified therapists to recommend a frequency or continuation of services without regard to whether or not the qualified therapist, after evaluation, found the services to be medically necessary. (*See* ECF No. 15 at ¶¶ 12, 78,

101, 103, 107, 133, 143, 157, 162-164, 170, 183.) "Although physicians refer patients for therapy,[10] the Relator's complaint alleges that it was D*efendants*—and not independent physicians—who determined the specific amount and duration of therapy to be provided and billed." (ECF No. 80 at 2.) Regardless of whether in particular instances MLF's policies and directives matched a qualified therapist's recommendation regarding a particular patient, the policies themselves directed all therapists to recommend services at higher levels or to continue services. The Court is able to reasonably infer from the FAC that therapists' recommendations to the Medicaid and Tricare programs, and facts used to justify the medical necessity of those services, were the false statements made in support of claims for reimbursement. Moreover, the FAC alleges that Defendants' policies were the cause of these statements. Thus, the false certification occurred not when a physician referred a child for therapy but rather when MLF submitted claims through the online submission system (HP Enterprise Services).[11]

Moreover, the Court is able to reasonably infer that because of MLF's policies and directives, some if not all therapists at one point falsified their progress notes by

///

---

[10]Nowhere in the FAC does it state that physicians' referrals, even if false, caused the submission of false claims. (*See* ECF No. 15 at ¶¶ 54-63.) Rather, the crux of the FAC's legal theory is that once patients arrive at MLF, the frequency and continuation of therapy services are directed by management, not based on a therapist's determination of medical necessity. Thus, the Gottliebs stated directives necessarily require therapists to falsify statements in their progress reports regarding the medical necessity of services. (*See id.* at ¶ 242 ("MLF management inserts its own opinion regarding the care of patients and overrides the opinion of the therapists which are based on patients' needs and deficits, in order to maximize its reimbursement"). While the FAC identifies instances where "ineligible" patients were referred by a physician to MLF, it appears the determination of ineligibility occurred after therapists evaluated and/or worked with the patient and deemed it medically appropriate to discharge the patient but was told not to discharge the patient and to, instead, falsify their progress notes.

[11]Defendants appear to misunderstand the false certification theory of liability in the context of therapy services. (*See* ECF No. 81 at 2 ("Relator does not sufficiently allege that any physician falsely recommended medically unnecessary therapy or allege the particulars of a scheme by MLF that resulted in doctors false certifying that therapy was medically necessary.").) The false claims alleged in the FAC stem not from the initial physician referral but from MLF's ongoing services to patients. The FAC argues that MLF's policies regarding the frequency and continuation of these services resulted in the rendering of medically unnecessary services.

1    recommending a frequency or continuation of therapy services they did not believe, after
2    evaluating the patient, to be medically necessary.

### 3.    Allegations of Upcoding

The public disclosure bar under both the federal and Nevada FCA "sets up a two-tiered inquiry," requiring a court to first determine whether the elements of public disclosure have been met and, if so, whether the relator is the original source of the information. *See A-1 Ambulance Service, Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000). To satisfy the first tier of the analysis, a court must establish that the relator's allegations are (1) substantially based on the (2) same allegations or transactions that (3) have been disclosed publicly in a criminal, civil, or administrative hearing to which the government is a party. *See* NRS § 357.100(1); 31 U.S.C. § 3730(e)(4)(A)(i). Once these elements are satisfied, the court must determine whether the relator is an "original source" under the statute. *See* NRS § 357.100(2); 31 U.S.C. § 3730(e)(4)(A) & (B).

*a.    First Tier - Public Disclosure Elements*

In their Motion, Defendants point to a public May 21, 2015, Nevada State Board of Physical Therapy Examiners' meeting in Las Vegas as the "administrative hearing to which the government was a party" and at which point public disclosure occurred. (ECF No. 68 at 17.) Because the Court takes judicial notice of the minutes of this meeting,[12] which are publicly available at the Board's website,[13] the Court views all facts as alleged and draws all inferences in the light most favorable to Plaintiff. *See Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). At the Board's meeting, Jonathan Gottlieb and his attorney followed up on a May 7, 2015, letter that MLF had received from the Board. The letter was created in response to an inquiry the Board had received from an MLF employee, who asked whether it was appropriate (or legal) to bill only one code

---

[12]Defendants cite to these minutes in footnote 4 of their Motion. (*See* ECF No. 68 at 17.)

[13] *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (a court may take judicial notice of a document if it is a matter of public record or its contents are alleged in and central to a compliant without converting a motion to dismiss into a motion for summary judgment).

13

for all physical therapy treatments for all patients. In the Board's response letter, addressed to MLF, the Board indicated that only licensed therapists could determine the appropriate code for services rendered. (Meeting Minutes, Nevada Board of Physical Therapy Examiners, (May 21, 2015).)[14] At the meeting, the letter sent to MLF was read into the record and was attached to the meeting minutes. *Id.*

Because an administrative hearing need not include fraud investigations or evidentiary presentations but at a minimum must be open to public attendance, permit public comment, and make its minutes public, the Board's meeting constitutes an administrative hearing under the FCA's public disclosure bar.[15] *See A-1 Ambulance Serv., Inc.*, 202 F.3d at 1244.

The Court must next determine if the disclosures at the meeting consisted of "allegations or transactions" that could give rise to an FCA claim. In order to meet this second requirement, there does not need to be an explicit allegation of fraud; rather, the public disclosure bar is met so long as the "critical elements of the fraudulent transaction" are disclosed in the public domain. *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1473 (9th Cir. 1996) (quoting *United States ex rel. Springfield Terminal Ry. V. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). In their Motion, Defendants state that the "public disclosure" at issue concerned a proposed plan (ECF No. 68 at 18); however, the minutes indicate otherwise. At the meeting, it was publicly disclosed that prior to MLF's receipt of the Board's letter, MLF required staff to agree, in writing, to bill under the one CPT code (97530). (Meeting Minutes, Nevada Board of Physical Therapy Examiners, (May 21, 2015).) In response, Jonathan indicated that after receiving the Board's letter, MLF abolished this requirement. At the meeting, Jonathan also stated that, based on the

---

[14] Accessed at http://ptboard.nv.gov/uploadedFiles/ptboardnvgov/content/About/Meetings/2015/2015-05-21_Minutes_ptboard.pdf.

[15] At one point in the meeting, the Board addressed whether MLF's use of CPT code 97530 for all functional one-on-one therapy sessions was appropriate. (*See* ECF No. 68 at 18.) But the meeting included other agenda items, such as determining whether certain licensees should be released from probation and whether certain applicants should be allowed to retake licensing exams or be granted licenses to practice in the state.

Board's assessment, MLF would have to limit what services it provides going forward. *Id.* Thus, before the Board's meeting, and possibly before MLF's receipt of the Board's letter, it appears that MLF provided a variety of services but billed them under just CPT code 97530.

Finally, the Court finds that the FAC's allegations concerning upcoding under CPT code 97530 are substantially based upon the statements made both at the meeting and in the Board's letter to MLF. "For a relator's allegations to be 'based upon' a prior public disclosure, 'the publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations.'" *United States ex rel. Mateski v. Ratheon Co.*, 816 F.3d 565, 573 (9th Cir. 2016) (quoting *United States ex rel. Meyer v. Horizon Health, Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts*, 792 F.3d 1121, 1128 n.6 (9th Cir. 2015)). At the meeting, Jonathan admitted that a variety of therapy services were provided at MLF yet in communications with the Board he stated that the use of one CPT code was required (at least prior to MLF's receipt of the May 7, 2015, letter). This is consistent with the allegations in the FAC. Moreover, because Plaintiff does not dispute that she attended the meeting or that she obtained a copy of the May 7, 2015, letter from the meeting, which she cites to in the FAC (*e.g.*, ECF No. 15 at ¶ 210), the Court finds that the allegations in the FAC are substantially based on the allegations and information regarding MLF's transactions regarding CPT code 97530 that were disclosed at the May 21, 2015, meeting.

### b. Second Tier - Original Source

An "original source" is an individual who has direct and independent knowledge of the information on which allegations of fraud are based, who has provided the information voluntarily to the government before bringing suit and where suit is based on that information. *See* § NRS 357.100(2)(a) – (c); 31 U.S.C. § 3730(e)(4)(B). Neither party addresses whether despite public disclosure having occurred at the Board's meeting, Welch was, in fact, the original source of that information or the allegations in the FAC.

///

Because public disclosure occurred on May 21, 2015, but Welch did not amend the original complaint to include allegations of upcoding until September 28, 2015, and does not allege that she was the employee who wrote the initial letter to the Board of Physical Therapy Examiners, the Court is unable to find that Welch was an original source of this information.

Therefore, claims based on Plaintiff's legal theory of upcoding are barred.

### 4. Allegations of Improper Practices

Defendants argue that Plaintiff cannot establish the prima facie elements of an FCA violation by citing to MLF's internal "policies," even if these policies amounted to questionable business practices. (ECF No. 68 at 21.) Defendants contend that any "false statements made in internal emails [] such as the statement that all children can make progress" were not material to the Government's decision to pay MLF. (*Id.*) The Court disagrees with Defendants' characterization of the primary legal theory advanced in the FAC.

As noted previously, the false statements used to obtain prior authorization and subsequent reimbursement concerned therapists' recommendations that the frequency or continuation of services were medically necessary as well as statements made to justify those recommendations, such as statements regarding a patient's progress. The FAC alleges that Defendant's policies and directives *caused* the making of the false statements and recommendations, and that these recommendations and statements were material to the Government's decision to pay (as neither Medicaid nor Tricare reimburse for medically unnecessary services). Moreover, because Defendants allegedly reprimand therapists when they refuse to provide a medically unnecessary recommendation (*see* ECF No. 15 at ¶¶ 96-99, 169-170, 183), the FAC adequately alleges that Defendants' policies were the cause of the false statements upon which claims for reimbursement were sought and obtained.

///

///

### 5. Patient H.W.

Defendants argue that the additional theory of liability alleged in the FAC regarding Patient H.W. fails to meet the requirements of Rule 9(b). (ECF No. 68 at 22.) The Court disagrees.

Defendant contends that the FAC fails to allege the "who" and "where" concerning the alleged fraud surrounding H.W.'s treatment. (*Id.*) The FAC alleges that H.W., a Tricare beneficiary, was receiving physical therapy until approximately May 2015, at which point H.W. terminated his treatment at MLF. (ECF No. 15 at ¶¶ 185-188.) Nonetheless, Defendants billed thirteen more therapy sessions for H.W. that never actually occurred. (*Id.* at ¶ 188.) These allegations permit the Court to draw the reasonable inference that MLF falsely billed Tricare for therapy sessions that were not provided to H.W., thereby stating a claim for relief plausible on its face under Rule 12(b)(6) and Rule 9(b).

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Defendant's Motion.

It is hereby ordered that Defendant's Motion to Dismiss (ECF No. 68) is granted in part and denied in part. Plaintiff will be precluded from asserting any claims based upon allegations of upcoding.

The Clerk is instructed to strike Defendants' Notice of Supplemental Authority (ECF No. 86) from the record. Plaintiff's motions to strike (ECF No. 87, 88) are denied as moot.

DATED THIS 9th day of May 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE